**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

In re: DURABILITY, Inc.

    Debtor.

------------------------

SCOTT P. KIRTLEY, Successor
Trustee of the Estate of
Durability, Inc.,

    Appellant,

  v.

SOVEREIGN LIFE INSURANCE
COMPANY OF CALIFORNIA;
CHUBB LIFE INSURANCE
COMPANY OF AMERICA; CHUBB
SOVEREIGN LIFE INSURANCE
COMPANY; JEFFERSON PILOT
FINANCIAL INSURANCE
COMPANY, their Successors and
Assigns,

    Appellees.

No.  04-5133

---

**ORDER**
Filed January 20, 2006

---

Before **KELLY**, **McKAY**, and **McCONNELL**, Circuit Judges.

---

This matter is before the court on appellee's petition for rehearing. Upon review, the panel grants rehearing. Accordingly, the court's order and judgment of December 20, 2005 is withdrawn and is replaced by a revised order and judgment, which is attached to this order.

Entered for the Court
ELISABETH A. SHUMAKER, Clerk

By:
    Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 20, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

In re: DURABILITY, Inc.

Debtor.

------------------------

SCOTT P. KIRTLEY, Successor
Trustee of the Estate of Durability,
Inc.,

Appellant,

v.

SOVEREIGN LIFE INSURANCE
COMPANY OF CALIFORNIA;
CHUBB LIFE INSURANCE
COMPANY OF AMERICA; CHUBB
SOVEREIGN LIFE INSURANCE
COMPANY; JEFFERSON PILOT
FINANCIAL INSURANCE
COMPANY, their Successors and
Assigns,

Appellees.

No. 04-5133
(D.C. No. CV-02-154-K(J))
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **McKAY**, and **McCONNELL**, Circuit Judges.

---

[*]     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Scott Kirtley, successor trustee of the estate of Durability, Inc. (Trustee), appeals from a final judgment granted in favor of Sovereign Life Insurance Company of California on his claim that he was entitled to assume a "key-man" life insurance policy on Fred I. Palmer, II, Durability's former president and sole shareholder. This is the second time this case has been before this court on appeal. *See Kirtley v. Sovereign Life Ins. Co. of Cal. (In re Durability)*, 212 F.3d 551 (10th Cir. 2000). Our jurisdiction arises under 28 U.S.C. § 1291.

The critical question in this case is whether a policy premium due September 3, 1986, was timely paid. Because the documentary evidence in the record overwhelmingly demonstrates that the September 3 premium was in fact timely paid, we reverse and remand for proceedings consistent with this order and judgment.

**I.**

This case has been in litigation since 1987. Its procedural history is thoroughly set out in the bankruptcy court's memorandum opinion filed February 15, 2002, *see* Aplt. App. Vol. III at 1797-1803; and, to some extent, in our

previous order reversing summary judgment in favor of Sovereign, *see Kirtley*, 212 F.3d at 553-54. Thus, we need not repeat it here except as relevant to our analysis.

The following facts are undisputed. Durability purchased a life insurance policy on Mr. Palmer in May 1984, which became incontestable in May 1986 "except for non-payment of premiums." Aplt. App. Vol. III at 1830. The policy provided that, "[t]o keep this policy in force *each premium* must be paid *in advance*," with "[t]he first premium due as of the policy date," and "[s]ubsequent premiums . . . payable . . . within the grace period. If any premium remains unpaid after the grace period, this policy will lapse." *Id.* at 1829 (emphasis added). The grace period lasted for "31 days after the premium due date for payment of each premium after the first." *Id.* The premium due date was the policy date; in this case, the third of each month.

The record indicates that, on April 27, 1984, Durability submitted a premium deposit of $42.08 with the policy application. *See id.* at 1885; *id.* Vol. I at 509. On May 14, 1984, Durability submitted a check representing the balance due on the May 3 premium, together with the amount due, *in advance*, for the second month's (June's) policy. *See id.* Vol. III at 1885; *id.* Vol. IV at 2431.

It is undisputed that Sovereign and Durability agreed that Durability would authorize Sovereign to make automatic drafts upon Durability's checking account

for the purpose of timely paying all future premiums under the terms of the policy. Thus, on May 15, 1984, Mr. Palmer signed a preauthorized check, or "PAC," agreement authorizing Sovereign to draft Durability's account on the fifteenth of each month for the premium payments. Sovereign received the signed form on May 23, 1984. The PAC agreement provided that, "[e]ach check, when paid, will constitute a receipt for the life insurance premium . . . with respect to which such check is drawn to the extent shown thereon, if and when Sovereign Life receives the actual cash therefor at its Home Office." *Id.* Vol. III at 1848. The PAC authorization specifically provided, and the bankruptcy court found, that it did not "modify or change the provisions of any policy . . . except that the right of the Insured to receive a premium notice is hereby expressly waived." *Id.* Sovereign began drafting premium payments on a monthly basis, a practice that continued after Richard Sullivan was appointed as receiver for Durability on August 15, 1986.

Accordingly, also on August 15, 1986, Sovereign drafted Durability's account for a premium payment. In our previous opinion, we stated that "Sovereign wrote the *September* 3 premium payment check to itself on August 15, 1986 . . ." *Kirtley*, 212 F.3d at 553 (emphasis added). Our statement was based

primarily on a stipulated fact [1] in the summary judgment materials before the bankruptcy court. But after remand Sovereign changed its position, based solely on the testimony of Mr. Van Koughnet, [2] who stated he had no personal recollection of anything specific to Durability's premium payments. Aplt. App. Vol. III at 1915. After remand, Mr. Van Koughnet asserted that PAC drafts, which were made on either the first or fifteenth day of each month, were *never* drafted to pay a premium due in the next month. *Id.* at 1961-62. Thus, after remand, Sovereign claimed that the August 15 draft was intended to pay the August 3 premium. *Id.* at 1949-50.

The August 15 PAC draft was returned unpaid on August 25 due to insufficient funds, Durability's bank account having been frozen when Durability went into receivership. *See id.* Vol. I at 511. Sovereign's witness testified that its practice was to resubmit returned PAC drafts. When the draft was again presented for payment on September 8, it again was returned; this time because of an undescribed error. *See id.*; *id.* Vol. III at 1781.

---

[1]    As we noted in our prior opinion, stipulations are "admissions of the parties that are conclusive without further evidentiary support in the record," and are enforced as a general rule. *Kirtley*, 212 F.3d at 555.

[2]    Mr. Van Koughnet had been a supervisor in the Underwriting Department, a manager of the Customer Service Department, and a director and assistant vice president for Sovereign between 1971 and 1995. Aplt. App. Vol. III at 1914.

On September 11, 1986, Mr. Sullivan informed Mark Farquahar, Sovereign's soliciting agent and the individual who brokered all of Durability's insurance policies, that he was Durability's receiver. The record does not reflect whether Mr. Farquahar passed this information on to Sovereign. Mr. Sullivan testified that he was instructed to "keep all life insurance on the life of [Mr.] Palmer in full force and effect," *id.* at 1730, and that he did so by approving the payment of a September 15 PAC draft for a policy premium, *see id.* at 1727-28. He testified that he did not believe he had to take any other steps because premium payments were made by automatic PAC draft. *Id.* at 1738-39.

Despite the fact that the August 15 draft was returned on August 25 and September 8, Sovereign asserted, and the bankruptcy court found, that Sovereign did not discover until September 18 that the draft had been returned unpaid. Sovereign prepared a "Notice of Returned Check" on September 19. *Id.* at 1861. The notice informed Durability that a check dated "8/15/86" had been returned, and instructed Durability to "return this notice with your personal check as soon as possible." *Id.* The notice indicated a premium due date of "9/3/86" and stated that a total amount of $131.75 was due by "10/4/86." *Id.* Mr. Sullivan testified that he never saw that notice.

Meanwhile, on September 15, Sovereign automatically drafted Durability's account for another premium payment. *Id.* at 1859. This draft was paid on

September 22. Before summary judgment was granted to Sovereign in 1999, Sovereign never mentioned this draft, and in fact, Mr. Van Koughnet had sworn in 1987 that *no* premium payments were received by Sovereign between September 3 and October 4, 1986. *Id.* Vol. I at 52. In this same affidavit, he also stated that Durability's policy was in full force and effect on September 3, 1986. *Id.* Another Sovereign witness had testified in 1994 that Durability's policy premiums "were properly and timely paid up until September 3, 1986." *Id.* at 150. Thus, before remand Sovereign contended that the return of the August 15 draft caused the September 3 premium not to be paid, and that the policy lapsed on October 4, 1986.

But after remand, and after the parties discovered that the September 15 draft had been paid, Sovereign changed its tact, asserting that the September 15 draft, and not the August 15 draft, "was intended to pay the premium due September 3, 1986 and was intended to pay the Policy to October 3, 1986." Aplee. Br. at 7-8. Mr. Van Koughnet testified for the first time in 2001 that the August 3 premium had not been paid when the August 15 draft was returned, so when Sovereign received the September 15 draft proceeds on September 22, instead of applying them to the September 3 premium, it applied the money to the August 3 premium.

Although the bankruptcy court made no finding in this regard, it was undisputed that Sovereign never notified Durability or Mr. Sullivan that it allegedly used the September 22 payment to satisfy an August 3 premium that was allegedly past due. When asked how Durability was "supposed to know that this September 15 draft was . . . applied to the August premium," Aplt. App. Vol. III at 1957, Mr. Van Koughnet replied, "I don't know," *id.* at 1958.

For an unexplained reason, Sovereign apparently did not draft Durability's account for another premium after drafting and retaining the September 15 PAC payment, even though Mr. Van Koughnet testified that Sovereign had the authority to do so under the PAC agreement, and even though Sovereign presented no evidence that it or Durability ever terminated the PAC agreement. Mr. Van Koughnet testified that, even if the policy lapsed, the PAC provided that Sovereign's authority to draft checks for premiums "shall continue in effect notwithstanding any . . . cancellation," unless it was previously terminated. *Id.* at 1943.

On October 6, 1986, Durability's creditors filed an involuntary petition in bankruptcy court, but Mr. Adelman, the newly-appointed Trustee, did not inform Sovereign of his appointment. On November 5, 1986, in accordance with its policy of extending the grace period in which to pay premiums for seventy-five

days without the need for formal reinstatement, Sovereign sent a mailgram to Durability stating:

> Please be informed your Sovereign policy 182155 has lapsed. To help you regain this valuable protection, the last payment offer you received has been extended ten days, to 11/12/86. You need not furnish evidence of good health. Payment of 263.50, which represents the monthly premiums due 9/3/86 and 10/3/86, will restore your protection, provided payment is made during the lifetime of all persons insured under this policy. Please act now to save this part of your financial security program.

*Id.* Vol. I at 507. Mr. Adelman testified that when he received the mailgram, he investigated the issue and discovered that the August 15 draft had been returned. *Id.* Vol. III at 1780. But he contended that he did not receive the notice in time to comply with the November 12 deadline.

Mr. Palmer had surgery on November 13 and discovered that he had terminal cancer. Mr. Adelman tendered the past-due payments to Sovereign on November 19, but Sovereign refused to reinstate the policy. On December 16, 1986, Sovereign informed the Trustee that the policy had lapsed on September 3, 1986, for nonpayment of premiums and that Durability would now have to provide proof of insurability in order to reinstate the policy. *Id.* Vol. IV at 2542.

During the bankruptcy proceedings, the Trustee asserted a right to assume the insurance contract. Sovereign raised the affirmative defense of lapse for nonpayment, but the Trustee made several counter-arguments. One was that the August 15 draft was intended to pay the September 3 premium in advance, and

payment of a policy premium during the grace period on September 22 timely paid the premium such that the policy was still in force on October 6, when bankruptcy was filed.

Alternatively, the Trustee argued that, if the bankruptcy court found that the August 15 draft was intended to pay the August 3 premium, Sovereign waived its right to declare a default by failing to timely declare and notice Durability of a lapse in September and by drafting, receiving, and applying the September 15 payment after the policy had lapsed by its terms. It further argued that Sovereign should be estopped from declaring a forfeiture because it had no right to unilaterally apply the September 15 PAC draft proceeds to the August 3 premium without notice. The Trustee also argued that Sovereign breached its duty to continue drafting monthly premium payments under the PAC and should be estopped from declaring a forfeiture on that basis.

The bankruptcy court found that "[t]he premium due September 3, 1986, was not received by Sovereign on or before October 4, 1986." *Id.* Vol. III at 1801. Accordingly, the bankruptcy court held that the policy lapsed before the filing of the bankruptcy case, and that the Trustee could not assume the insurance contract. The court rejected all of the Trustee's alternate claims, including its claim of waiver or estoppel based on Sovereign's conduct. The Trustee appeals.

**II.**

-10-

> Our review of the bankruptcy court's decision is governed by the same standards of review that govern the district court's review of the bankruptcy court. Accordingly we review the bankruptcy court's legal determinations *de novo* and its factual findings under the clearly erroneous standard. A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made.

*Connolly v. Harris Trust Co. of Cal. (In re Miniscribe Corp.)*, 309 F.3d 1234, 1240 (10th Cir. 2002) (quotation marks omitted). The parties agree that Oklahoma law applies. Thus, in conducting our review, we have applied the principle that, "[a] contract of insurance ordinarily must be construed liberally in favor of an insured and strictly against the insurer where there exists any ambiguity, doubt or uncertainty as to its meaning." *Continental Cas. Co. v. Beaty*, 455 P.2d 684, 688 (Okla. 1969). We also acknowledge that,

> it is quite generally held that the provisions of an insurance policy requiring prompt payment of the premiums, and the provisions for lapse or cessation of the policy for nonprompt payment are valid, essential, and enforceable provisions of the contract, and that the insurer cannot be denied the benefits of such wholesome provisions of the policy, unless the insurer has voluntarily waived the same, or is held to have waived the same by some act indicating an intention not to act or rely upon the lapse or cessation, or has proceeded or acted in a way or manner wholly inconsistent with the enforcement of the provisions for lapse or cessation for nonprompt payment.

*Great S. Life Ins. Co. v. Brooks*, 26 P.2d 430, 433 (Okla. 1933) (citations omitted).

## III.

In our previous opinion, we noted that, "[w]hether the policy was an assumable executory contract turns on the question of whether the contract terminated before bankruptcy was filed." *Kirtley*, 212 F.3d at 557-58. We recognized that, if the policy lapsed before the bankruptcy filing on October 6, the Trustee could not assume the contract by paying late premiums. But we reversed the bankruptcy court's grant of summary judgment to Sovereign that was based on its finding that the September 3 premium payment had not been made. We held that the bankruptcy court had improperly refused to consider the Trustee's supplemental affidavit responses that raised genuine issues of material fact whether Sovereign had "received the September premium payment and thus could not claim forfeiture for nonpayment, and . . . that termination of the insurance contract was not proper because of lack of notice." *Id.* at 558 (footnote omitted).

We further held that, if the September premium had been timely paid, as a matter of law, the Trustee's November 19, 1986, tender of payment for past-due premiums would cure a default because § 108(b) of the Bankruptcy Code extends for sixty days from the date of the bankruptcy filing the grace period in which to pay policy premiums and assume an insurance contract. *Id.* at 558-59.

**IV.**

-12-

We first address whether the bankruptcy court's finding that the August 15 draft was intended to pay the August 3 premium is clearly erroneous.

**A. Burden of proof.** Sovereign repeatedly urged denial of Durability's motion to assume the insurance contract (and urges affirmance of the denial in this Court) on its assertion that Durability failed to submit sufficient evidence to carry its burden of proof. But in Oklahoma, if an insurance company seeks forfeiture of an established policy for nonpayment of premiums, that is an affirmative defense on which the insurance company bears the burden of proof. *See Nat'l Aid Life Ass'n v. Cooper*, 69 P.2d 58, 59 (Okla. 1937) (noting that insurance company "admitted issuance and delivery of the policy and assumed the burden of proof . . . that the deceased did not pay said amount specified . . . and thereby allowed the policy to lapse"); *Am. Nat'l Ins. Co. v. Smith*, 211 P. 1029, 1029 (Okla. 1923) ("The answer of the defendant admitted the execution of the insurance contracts attached to the plaintiff's petition, but specifically denied any liability thereon, and set up as an affirmative defense that the policies of insurance were canceled . . . for nonpayment of premiums . . . .").

The only evidence Sovereign submitted in support of a finding that the August 3 premium was to be paid by the August 15 draft was Mr. Van Koughnet's deposition testimony, computer-generated documents demonstrating paid premiums, and a notice of returned check. Although in its appellate brief,

-13-

Sovereign contends that the Trustee presented no evidence to contradict Mr. Van Koughnet's testimony, as discussed more specifically below, the Trustee argued that Mr. Van Koughnet's testimony was inconsistent and contradicted the documentary evidence and policy requirements.

**B. The Paid Premium Registers.** Sovereign submitted several computer-generated "Paid Premium Register[s]," which were run on the fifteenth of each month. Aplt. App. Vol. III at 1982-85. Mr. Van Koughnet testified that Sovereign initially posted PAC drafts as received on the day it drafted them. He explained that, "[w]hen a check is received by the company, that's when it's posted to the company's records as a paid premium . . . until it's notified otherwise . . . [because] the policy . . . provides that to keep the policy in force, each premium must be paid in advance." *Id.* at 1948.

In his deposition, which was made part of the trial record, Mr. Van Koughnet was asked about the June, July, and August 1986 Paid Premium registers, which were designated as exhibits 206, 207 and 208. *See id.* at 1915-17. Durability's policy number is 182155. Exhibit 206 is the register with a "RUN DATE" of "07/15/86." It has "07-03-86" in the column entitled "DUE DATE," and the date of "06-16-86" is listed under the column entitled "LAST PREM PD." *Id.* at 1983. Similarly, exhibit 207, which is the register with a "RUN DATE" of "08/15/86," has "08-03-86" in the column entitled "DUE

-14-

DATE," and the date of "07-15-86" is listed under the column entitled "LAST PREM PD." *Id.* at 1984. And exhibit 208, which is the paid premium register with a "RUN DATE" of "09/15/86," has "09-03-86" in the column entitled "DUE DATE," and the date of "08-15-86" is listed under the column entitled "LAST PREM PD." *Id.* at 1985.

Thus, on their faces, the "Paid Premium" registers generated on the fifteenth of each month indicate that Durability's premiums due that month had been paid on the fifteenth or sixteenth day of the previous month. On the fifteenth of July, for example, the register states that the premium due July 3 was paid on June 16. But here is how Mr. Van Koughnet interpreted these registers:

> Q: Does [exhibit 206] reflect a premium payment on Policy 182155?
> A: . . . . Yes, it does.
> . . . .
> Q: What was the due date for that premium?
> A: Well, . . . the last premium that was paid was paid on June 16,
> '86. That takes the policy to 07/03/86 as a result of that payment.
> . . . .
> Q: What was the due date of the premium that was paid, the $131.75?

A: Well, like I said, the premium that was paid was June, and that paid the policy to July.

Q: How about the July payment?

A: I don't believe this reflects a July payment.

Q: Isn't that what this Exhibit 206 reflects, that the run date was July 15th, '86, and it was [] covering the premium for July 3rd, '86, in the amount of $131.75?

A: You know, based on this report, it appears to me that the last premium that was paid was June of '86, paying the premium to July of '86. This says "due date" on the top of this column.

Q: But that was the last premium paid.

A: No. There's a "due date," and there's a "last premium paid" column.

Q: And those are different payments?

A: Yes.

. . . .

Q: What does this 207 reflect?

A: It reflects that the last premium paid was . . . July 15, which paid the premium to August 3rd, '86.

Q. Was this run date on August 15th, '86?

A: Right.

Q: Turning on to 208. . . .

. . . .

Q: What was the due date for this premium?

A: Again, this policy was drafted on August 15, '86. It paid the premium to September 3, '86.

Aplt. App. at 1915-1917. The interpretation that the term "due date" meant the "next" due date makes no sense in a document purporting to simply list, month by month, whether a premium had been paid as of a particular run date.

Nevertheless, if Mr. Van Koughnet's testimony created an ambiguity in what the Paid Premium register meant, an ambiguity must be interpreted in favor of coverage. *See Continental Cas. Co.*, 455 P.2d at 688.

-16-

**C. Premium Receipt list.** Mr. Van Koughnet was then questioned about the September 22, 1986, Premium Receipt list, which was exhibit 209. Aplt. App. Vol. III at 1918. Durability's policy number and information are located on the thirteenth line of the exhibit. For Durability's policy, the exhibit shows a date of "10/86" under a column entitled "PD-TO;" an entry of "101" under a column entitled "TRANS;" a column entitled "Premium" in which "$131.75-" was recorded; and an "ENTRY DT" column with the date of "09/22/86." *Id.* at 1986. On its face, therefore, the Premium Receipt list indicates that premiums were paid to October 1986 when, on September 22, credit for a premium was taken away. It is undisputed that the draft that was unpaid was the August 15 draft. But Mr. Van Koughnet testified as follows:

> Q: Under the second column, "Paid-to, transfer" of 8/86[3], what is that?
> A: Well, the 08/86 date is the paid-to date, as indicated at the top of that column. The ['TRANS'] column is a transaction [*i.e.*, not "transfer"] column. And that 101 that corresponds to the October '86 date is a transaction code 101. And that code is a reversal code.
> Q: Is that taking the $131.75 premium, on your records, that were paid up through October '86, tak[ing] it away from that credit?
> A: That is correct, that the September '86 premium was reversed.
> Q: So the payment that was paid – and what date was this paid?
> A: Well it doesn't – it presumably was paid on the 09/15 preauthorized check deposit, just like the other ones that we had looked at on the 15th of [the] month . . . . The September draft would

---

[3]      The twelfth line, directly above the line that Durability's policy reflected, contains the date of "08/86" in the "PD-TO" column. Durability's line, however, reflected the date of "10/86" in that column. It appears that counsel initially referred to the wrong line in his question asking what the second column meant.

have been drafted in its normal fashion on its appropriate date, and this report reflects that that payment was reversed.

. . . .

. . . . When that payment was made by preauthorized check draft on September 15, . . . that in fact advanced the premium paid-to date to October of '86. However, because of a returned draft for August of 1986, this payment was reversed.

*Id.* at 1918-20. Contrary to Mr. Van Koughnet's testimony, nothing on the face of the Premium Receipt list indicates that it was the September 15 payment that was reversed, and his interpretation is contrary to the undisputed fact that the August 15 PAC payment remained unpaid. And Sovereign apparently produced nothing evincing that it *ever* gave Durability's account credit for the September 15 draft that was undisputedly paid. For example, there should have been a Premiums Paid register indicating receipt of the September 15 draft, but Sovereign apparently did not produce it.

But even accepting Mr. Van Koughnet's interpretation, he agreed that Durability's premiums had been "paid up *through* October '86," with the payment of the September 15 PAC draft, *i.e.*, that the September 15 PAC draft paid the October 3 premium, thereby making the premiums paid *through* October. *See id.* at 1919; *see also id.* Vol. II at 1448 (stipulation providing that "[a] premium payment [paid] on the 3rd day of the month paid the Policy to the 3rd day of the next month"). This testimony supports the Trustee's assertion that premiums were paid in advance.

But the testimony is inconsistent with Mr. Van Koughnet's previous statement that the August 15 draft paid the August 3 premium on the Paid Premium register. If the September 15 PAC payment, before reversal, originally paid the premiums *through* October, then the August 15 payment would have paid the September 3 premium, not the August 3 premium. Sovereign submitted no other documentary or other evidence that shows to which premium it actually applied the September 22 payment.

**D. Previous testimony.** Mr. Van Koughnet's 2001 deposition testimony that an August 15 payment was supposed to pay the August 3 premium conflicts with his February 1987 affidavit filed before remand, where he stated that Durability's policy was in full force and effect on September 3, 1986. *See id.* Vol. I at 88. If the August 15 draft was for payment of the August 3 premium, then the policy had lapsed on September 3 when the August 15 draft was not timely paid; it would not have been in full force and effect. It also conflicts with other testimony that Durability's premiums were timely paid until September 3, 1986.

**E. Policy language.** As Mr. Van Koughnet conceded, the insurance contract required premium payments to be made *in advance* of the premium's due date in order to keep the policy in force. Thus, his testimony that a premium paid on August 15 would only pay the policy *to* September 3, *i.e.*, that the August 15

payment was a grace-period payment for the August 3 premium, *see id.* Vol. III at 1917, instead of being an advance payment for the September 3 premium, is inconsistent with the policy requirements. Not only is this interpretation contrary to the express policy language, it is unlikely that Sovereign would arrange to draft every premium payment two weeks *after* it was due, thereby giving an insured at least two weeks of free coverage. This is especially true given the time it took for a draft to clear the issuing bank, Sovereign's policy of resubmitting returned checks, and the fact that no time was left within the grace period in which to notify an insured of a returned check before the policy lapsed. As Mr. Van Koughnet noted, it was important for Sovereign's clerks to quickly send out notices of returned checks to insureds so that they had time during a grace period to cure any defaults before the policy lapsed. *See Id.* at 1954-55. As demonstrated in this case, if Sovereign did not draft a premium check until two weeks into the grace period, it would not even become aware of a policy lapse resulting from a returned check before the grace period had ended.

**F. PAC agreement.** As the bankruptcy court noted, the PAC agreement expressly provided that it did *not* modify the policy's requirements that premiums must be made in advance. Thus proof of the drafting, receipt, and retention of the September 15 PAC draft was a prima facie showing that Durability timely paid

the October 3 premium.  Mr. Van Koughnet's testimony is contradictory to the terms of the parties' PAC agreement.

**G.  Sovereign's conduct.**  Mr. Van Koughnet's interpretation is also inconsistent with Sovereign's conduct and with the documents Sovereign sent to Durability when it discovered the August 15 draft had been returned.  As noted above, if the August 15 draft was in fact for the August 3 premium, then Durability's policy lapsed on September 3 by its terms.  But Sovereign did not declare a policy lapse or notify Durability of a lapse at that time.

**H.  Notice of Returned Check**.  Instead, on September 19, Sovereign sent Durability the notice of returned check, which denotes the premium's due date of September 3.  In the same notice, Sovereign invited Durability to pay the premium "as soon as possible" with a personal check.  *Id.* at 1861.  This notice is consistent with the policy's language permitting Durability to make a premium payment within the thirty-one day grace period that ended on October 4, but it would not be consistent if the policy had already lapsed.

In addition, the notice stated on September 19 that the "total due" was $131.75.  If, as Mr. Van Koughnet now asserts, neither the August 3 nor the September 3 premiums had been paid by September 19 when the notice was sent, the "total due" should have been for twice that amount.

In trying to explain away the fact that the September 19 returned-check notice, on its face, indicated that the returned August PAC payment was for the September 3 premium, Mr. Van Koughnet asserted that the notice took into account that Sovereign had already paid the August 3 premium with the September 15 PAC draft. He claimed that "the clerk doing the processing knew that there was a reversal that was to be done immediately following the mailing of the notice [of returned check]," so the clerk must have put the September 3 due date as "a result of the reversal of the August draft" to show that it was "the due date of the premium *following* the reversal of the September premium" that had not yet been accomplished. *Id.* at 1953-54 (emphasis added). But the record is devoid of any testimony by any clerk who handled the September 19 notice in 1986. When asked in 2001 whether he was familiar with "that September 15th draft," Mr. Van Koughnet stated that he was "familiar with . . . what's transpired by my review of the documents that were supplied to me." *Id.* at 1935. Because he admitted to having no personal knowledge of what actually happened, Mr. Van Koughnet's explanation appears to be pure speculation.

His speculation makes no sense and is contrary to the documentary evidence, given the timing of the events. The record demonstrates, and Mr. Van Koughnet testified, that the September 15 draft was not even paid by Durability's receiver's bank until September 22. On September 19, therefore, Sovereign

-22-

employees had no way of knowing whether the September 15 PAC draft was going to be paid or whether it would be returned unpaid, just like the August 15 draft. Thus the notice of returned check, on its face, indicates that the August 15 draft was to pay the September 3 premium.

**I. Documents sent to third parties.** Although Durability inexplicably does not mention these documents in its appellate brief,[4] documents Sovereign sent to third parties also indicate that Durability paid its premiums in advance and not during the grace period. The record contains two standard insurance confirmation inquiries that Mr. Van Koughnet signed in 1984 and 1985. On the first one, information was requested that would be correct as of November 30, 1984. Sovereign's response was filled out on December 21, 1984. *See id.* Vol. IV at 2191. The inquiry response indicates that, as of November 30, 1984, Durability's premiums were already "paid to" January 1985, meaning that the December premium had already been paid by November 30. *See id.* Similarly, on the second inquiry form, information was requested as of November 30, 1985. Sovereign's response was filled out on December 18, 1985. *See id.* at 2185-86. The response indicates that, as of November 30, 1985, Durability's premium was "paid to" January 1986, and that there was an "unearned premium" for

---

[4]     Because of the Trustee's failure to discuss these documents on appeal, we do not rely on them for our conclusion. We note only that other important documentary evidence produced by Sovereign or its agents is contrary to the bankruptcy court's finding.

Durability's account of $103.70, *id.* at 2185, which was the amount of a monthly PAC premium at that time, *see id.* at 2187. This documentary evidence squarely contradicts Mr. Van Koughnet's interpretation that Durability's premium payments were regularly made in arrears, during the grace period, instead of in advance and his assertion that PAC drafts were never used to pay the following month's premium.

### J. Checks and other documents indicating advance payment.

Finally, there are copies of checks in the record indicating that Durability paid its first two premium payments, for May and June 1984, in advance of their due dates. *See id.* Vol. III at 1885. And a notice from Sovereign's accounting department dated June 4, 1984, shows that Sovereign already had on deposit both the May and the June premium payments, which affirms the advance payment. *Id.* Vol. IV at 2431.

In sum, our close review of the record leaves us "with the definite and firm conviction that a mistake has been made." *In re Miniscribe Corp.*, 309 F.3d at 1240. Even though the September 3 premium was not paid as usual because of the return of the August 15 PAC draft, Sovereign received money to pay that premium with the draft cashed and retained on September 22. The policy was therefore paid to October 3 and was still in effect, albeit in a grace period, on October 6 when bankruptcy was filed. The Trustee therefore had the right to

-24-

assume the insurance contract and he properly and timely tendered money to do so.  We therefore reverse and remand for entry of judgment in favor of the Trustee on this basis.

### V.  Alternative basis for reversal

But even if we accepted the bankruptcy court's finding that the August 15 draft was intended to pay the August 3 premium, we would reverse on an alternate basis.  The Trustee alternatively posed two questions:  (1) if the bankruptcy court was correct in finding that the August 15 draft was intended to pay the August 3 premium, did Sovereign waive its right to declare a default by failing to timely declare and notify Durability of a lapse in September and by drafting, receiving, and applying the September 15 payment after the policy had lapsed by its terms; and (2) should Sovereign be estopped from declaring a forfeiture because it had no right to unilaterally apply the September 15 PAC draft proceeds to the August premium instead of to the September premium without notice.  Based on our application of Oklahoma law, we answer both questions affirmatively.

Mr. Van Koughnet conceded that the September 15, 1986 draft "was paid" on the proper date, but that "thereafter it was reversed . . . to cover the premium that was not paid, which was August of '86."  Aplt. App. Vol. III at 1936.  He

testified that on September 22, Sovereign applied the funds paid under the September 15 draft to the August 3 premium without notice to Durability. *See id.* at 1920, 1958.

As stated earlier in this order and judgment, under Oklahoma law,

> waiver may be shown by a course of action on the part of insured which treats the policy as a valid and subsisting policy which the insurer could have declared forfeited because of a breach or nonpayment. And likewise that the insurer may by a course of conduct be estopped from asserting cessation or lapse of a policy for nonprompt payment where there was a course of action . . . to accept payments out of time . . . .
>
> However, it is quite generally held that the provisions of an insurance policy requiring prompt payment of the premiums, and the provisions for lapse or cessation of the policy for nonprompt payment are valid, essential, and enforceable provisions of the contract, and that the insurer cannot be denied the benefits of such wholesome provisions of the policy unless the insurer has voluntarily waived the same, or is held to have waived the same by some act indicating an intention not to act or rely upon the lapse or cessation, or has proceeded or acted in a way or manner wholly inconsistent with the enforcement of the provisions for lapse or cessation for nonprompt payment.

*Brooks*, 26 P.2d at 433 (citations omitted). In his briefing to the bankruptcy court, the Trustee cited *Equitable Life Assurance Society of United States v. Davis*, 58 P.2d 542 (Okla. 1935). There, the Oklahoma Supreme Court held that an

> [i]nsured [is] presumed to rely on the course of proceedings long established, and naturally would expect that his premium payments would be made as usual. Where any course of proceedings is followed in the payment of premiums, a divergence from a course of proceedings by the insurer, without notifying the insured, will estop the insurer from defending a suit on the policy for nonpayment of premiums.
>
> . . . .

-27-

> [H]aving once undertaken to act in insured's behalf in this regard, and all parties having led insured to rely upon a continuance of such a course of action, they cannot, without warning or notice, discontinue making such payments, to the detriment of insured or the beneficiary in this policy. Once having undertaken the task, they must perform it diligently, well, and without neglect, just as a man is not obliged to enter a position of peril to save another, but having done so he is not to be permitted to bring the person out of the perilous position, and then allow him to perish, through negligence.

*Id.* at 545-46.

For the purposes of our waiver/estoppel analysis, we will assume that the bankruptcy court's finding that the returned August 15 payment was for the August 3 premium, and not for the September 3 premium, is not clearly erroneous. Applying this assumption, the August 3 premium payment was not made by September 3. Thus, as a matter of law, because the August payment was not made during the thirty-one day grace period, the insurance policy lapsed by its terms on September 3 unless Sovereign waived the lapse.

We also assume that the bankruptcy court's finding that Sovereign did not discover until September 18 that the August 15 draft was returned is not clearly erroneous. Assuming these facts, it is undisputed that, after it discovered on September 18 that the policy had lapsed on September 3, Sovereign did not notify Durability of the policy's lapse or cancel the September 15 draft that Sovereign contends was intended to pay the September 3 premium. Instead, it informed Durability, through the notice of returned check, only that the August 15 draft had

-28-

not been paid, and that Durability should bring in a personal check to cover the returned PAC draft "as soon as possible." Aplt. App. Vol. III at 1861. Then, on September 22, Sovereign retained the funds received from Durability's bank for the September 15 PAC draft. The Trustee cited cases from other states holding that, when an insurer accepts a premium payment for a subsequent month, the insurer waives the right to claim that the policy lapsed for failure to timely make a prior premium payment.

But the bankruptcy court rejected the Trustee's waiver/estoppel argument. First, it distinguished the cases cited by the Trustee with its finding that Sovereign did not know on September 15, when it drafted the September premium, that the August draft had been returned. But the court ignored the undisputed fact that Sovereign *did* know on September 22, when it retained and allegedly applied the funds to the August 3 premium, that the policy had lapsed, and yet it still accepted, retained, and applied the funds. Thus we do not see the distinction the bankruptcy court made.

In addition, the bankruptcy court found that Sovereign's conduct of demanding on September 19 "that Durability bring the premiums on the Policy current on or before October 4, 1986" established that it did not intend to waive its right to premiums owed. *Id.* at 1806. But this statement misses the Trustee's point that Sovereign waived its right to claim that the September premium was not

paid once it kept the money that it withdrew by PAC draft to pay the *September* premium without warning Durability that it was going to do something different with the PAC proceeds than it had done for the past two years.

As stated above, the notice of returned check simply and specifically stated that the August 15 check had been returned and that Durability should return the notice with a *personal* check "as soon as possible." *Id.* at 1861. It further provided that Durability had until October 4, 1986, to make the "total" payment due September 3, 1986 of $131.75. *Id.* And the parties' PAC agreement provided that "*[e]ach* check, when paid, will constitute a receipt for the life insurance premium . . . *with respect to which such check is drawn* to the extent shown thereon . . . ." *Id.* at 1848 (emphasis added), and Sovereign contends that the September 15 draft was intended to pay for the September 3 premium. As the bankruptcy court noted, "[t]he modification of a contract requires the mutual assent of the parties" in Oklahoma. *Id.* at 1809 (citing Oklahoma law). Because the PAC agreement provided that each PAC draft would serve as a receipt for the premium for which it was drawn, it appears that, when Sovereign received and cashed the September 15 payment without further notifying Durability that it was going to do anything other than apply the payment to the September 3 premium as provided by the PAC agreement and the parties' longstanding practice, Sovereign waived its right to later claim, or should be estopped from asserting, that the

September 3 premium had not been paid. *See Equitable Life Assurance Soc'y*, 58 P.2d at 545; *see also Am. Ins. Union v. Mehrton*, 300 P. 659, 663 (Okla. 1931) (holding that conduct of insurance company in receiving and keeping reinstatement application estopped it from "setting up the defense of nonpayment").

In sum, Sovereign could have declared the policy as lapsed on September 18, when it discovered that the August 15 check was returned, but it did not do so. Instead, it gave Durability an opportunity to make the August 3 payment "as soon as possible" with a personal check and waived its right to declare a default. *See Ill. Bankers Life Assurance Co. v. Cutlip*, 49 P.2d 1051, 1060 (Okla. 1935) (noting that an insurer waives provisions requiring prompt payment by treating the policy as valid when it could have declared forfeiture and also may be estopped from declaring lapse for nonprompt payment when it accepts payments out of time). Because Sovereign, with full knowledge that the lapse had occurred, chose to keep the proceeds of the September 15 PAC draft and never informed Durability of its plan to use those proceeds for something other than what the draft was intended (to pay the September 3 premium under Sovereign's contention), under Oklahoma law Sovereign is estopped to claim that the September 3 premium was not paid. Thus, the policy did not lapse on October 4, but Sovereign still had the right to be paid the August 3 premium. Therefore,

when the bankruptcy petition was filed on October 6, 1986, the Trustee had the right to assume the bankruptcy contract by tendering any past-due premiums to Sovereign within the sixty-day period prescribed by statute.

The judgment of the district court is REVERSED and REMANDED for further proceedings consistent with this order and judgment.

Entered for the Court

Michael W. McConnell
Circuit Judge